1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10
11
12
13
14
15
16

MALAIKA BROOKS,

              Plaintiff,

    v.

CITY OF SEATTLE, et al.,

              Defendants.

CASE NO. C06-1681RAJ

ORDER

17

## I.   INTRODUCTION

18
19
20
21
22
23
24
25
26
27
28

      This matter comes before the court on Defendants' two motions for summary judgment (Dkt. ## 192, 202), Plaintiff's motion to amend her complaint (Dkt. # 229) and her motion to file certain documents under seal (Dkt. # 217).  Plaintiff requested oral argument on both summary judgment motions, but the court finds the motions suitable for disposition based on the moving papers and documents submitted in support and in opposition.  For the reasons stated below, the court DENIES Defendants' first summary judgment motion (Dkt. # 192), GRANTS their second summary judgment motion (Dkt. # 202), GRANTS in part and DENIES in part Plaintiff's motion to amend (Dkt. # 229), and DENIES her motion to seal documents (Dkt. # 217).

ORDER  – 1

## II.    BACKGROUND

The court recounts the facts underlying this suit by taking all inferences from the evidence in the light most favorable to Malaika Brooks, the Plaintiff. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 885 & n.1 (9th Cir. 2005) (noting court's obligation in construing evidence relevant to summary judgment motion).

**A.    The November 2004 Traffic Stop, Use of Force, and Arrest**

On the morning of November 23, 2004, Seattle Police Department ("SPD") Officer Juan Ornelas stopped Ms. Brooks for speeding. According to Ofc. Ornelas's incident report, Ms. Brooks was driving 32 miles per hour in a school zone, 12 miles per hour more than the posted limit. Ms. Brooks was in the process of dropping her minor son off at school. Her son left her car just after Ofc. Ornelas stopped it. Although Ms. Brooks disputes that she was speeding, it is undisputed that she stopped her car in compliance with Ofc. Ornelas's command.

Ofc. Ornelas prepared a notice of the traffic infraction and requested that Ms. Brooks sign it. The notice form contained a "Defendant's Signature" block stating as follows:

> WITHOUT ADMITTING TO HAVING COMMITTED EACH OF THE ABOVE OFFENSES, BY SIGNING THIS DOCUMENT I ACKNOWLEDGE RECEIPT OF THIS NOTICE OF INFRACTION AND PROMISE TO RESPOND AS DIRECTED ON THIS NOTICE.

Zubel Decl. (Dkt. # 208), Ex. 4. Ms. Brooks refused to sign the notice.

Ofc. Donald Jones joined Ofc. Ornelas. After being informed of the situation, he told Ms. Brooks to sign the notice, and emphasized that signing it was not an admission of guilt. Ms. Brooks continued to refuse to sign the notice. Ofc. Jones explained that if she did not sign the notice, she would be arrested. This threat was insufficient to convince Ms. Brooks to sign the notice.

ORDER – 2

Ofc. Ornelas radioed a request for SPD Sergeant Steven Daman to come to the scene. After additional attempts to convince Ms. Brooks to sign the notice, Sgt. Daman ordered Ofcs. Jones and Ornelas to arrest Ms. Brooks. Sgt. Daman observed the remainder of the confrontation between Ofc. Jones, Ofc. Ornelas, and Ms. Brooks, but did not directly assist his subordinate officers.

Initial attempts to arrest Ms. Brooks were unsuccessful. Ms. Brooks would not comply with the officers' orders to leave her car. Ofc. Ornelas then used a pain compliance hold on Ms. Brooks' left arm in an effort to remove her from her car. Still, Ms. Brooks remained in the car. Ms. Brooks does not deny the officers' statements that she stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car. Neither party has submitted evidence as to how much time passed between Ms. Brooks' initial refusal to sign the notice and Ofc. Ornelas's use of a pain compliance hold. The surrounding circumstances (e.g., summoning Sgt. Daman to the scene) suggest that none of the officers' decisions were rushed.

Ofc. Jones then brandished a taser and threatened to use it on Ms. Brooks. He "yelled" at her, and asked her if she knew "how many volts" the taser had. Brooks Decl. (Dkt. # 206) ¶ 9; *see also* Jones Decl. (Dkt. # 196) Ex. A ("I also informed Brooks that the taser was fifty thousand volts and that the taser was going to hurt extremely bad if applied."). Ms. Brooks told Ofc. Jones that she was pregnant, and was two months away from her due date. According to Ms. Brooks, Ofc. Jones asked "How pregnant are you?" Brooks Decl. (Dkt. # 206) ¶ 9. Ofc. Jones demonstrated the arcing of electricity between the two contact points of the taser, but this did not persuade Ms. Brooks to leave her car. Before Ofc. Jones used the taser on Ms. Brooks, Ofc. Ornelas reached across Ms. Brooks to turn off the ignition in her car and remove the key. Ornelas Decl., Ex. A (Incident Report at 3).

ORDER – 3

Ofc. Jones then discharged the taser once on Ms. Brooks' thigh, once on her left shoulder, and once on her neck. Although the parties dispute the timing of the taser shocks, there is no dispute that all three shocks occurred within a minute or so. A jury could conclude that Ms. Brooks, stunned by the taser, could not reasonably have exited her vehicle in the brief intervals between the taser shocks. Ms. Brooks asserts that the taser shocks were "extremely painful." Brooks Decl. (Dkt. # 206) ¶ 10. The taser shocks caused her to "instinctively" honk her horn and cry for help. *Id.*

After using the taser, Ofc. Jones and Ofc. Ornelas were able to remove Ms. Brooks from her car. The officers held Ms. Brooks face down on the ground while handcuffing her. They placed her in a patrol car and transported her to a hospital.

According to Ms. Brooks, the taser not only caused her intense pain, it permanently scarred her. She gave birth to a healthy daughter a few months after her arrest. There is no evidence that the use of the taser harmed her daughter.

Ms. Brooks asserts federal claims for excessive use of force against Ofc. Jones, Ofc. Ornelas, Sgt. Daman, SPD Chief R. Gil Kerlikowske, and the City of Seattle (the "City"). She also asserts state law claims for negligence against Chief Kerlikowske and the City, and state law claims for assault and battery against the three SPD officers who participated in her arrest.

### III.   ANALYSIS

Defendants' summary judgment motions collectively seek dismissal of all of Ms. Brooks' claims. On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must

ORDER – 4

1   initially show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*,
2   477 U.S. 317, 323 (1986).  The opposing party must then show a genuine issue of fact for
3   trial.  *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The
4   opposing party must present probative evidence to support its claim or defense.  *Intel*
5   *Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  When
6   confronted with purely legal questions, the court does not defer to the non-moving party.
7
8   **A.   Ms. Brooks' § 1983 Claims Against the Officers Survive Summary Judgment.**
9           Ms. Brooks invokes 42 U.S.C. § 1983 for her claim that the SPD officers used
10  excessive force against her.  Section 1983 creates a remedy for violations of federal rights
11  by defendants who act under color of state law.  *Motley v. Parks*, 432 F.3d 1072, 1077
12  (9th Cir. 2005).
13          An individual defendant accused of violating § 1983 often invokes qualified
14  immunity, a defense that ensures that only violations of "clearly established" federal
15  rights will result in § 1983 liability.  *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985).
16  Qualified immunity applies where the scope of the federal right the plaintiff invokes was
17  not "clearly established," or when the defendant's "mistake as to what the law requires"
18  is reasonable.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007).
19
20          To assess qualified immunity at the summary judgment stage, the court must
21  determine whether the facts viewed in the light most favorable to the plaintiff establish
22  the violation of a federal right.  *Id.* at 471.  If so, then the court must consider whether the
23  right was clearly established and, if it is, whether the defendant's mistake as to what the
24  law requires is reasonable.  *Id.* (quoting *Motley*, 432 F.3d at 1077).  The court must
25  consider the questions in the order set forth above.  *Id.* ("Even if it might be easier
26  analytically to address whether the scope of the right was clearly established, [a court is]
27  to decide the constitutional question first.") (internal quotation omitted).
28

ORDER  – 5

### 1.    Standards for Excessive Force Claim

Ms. Brooks' excessive force claims against the officers who arrested her invoke the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Because the Fourth Amendment requires only objectively reasonable conduct, the constitutional inquiry in an excessive force claim is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (internal quotation omitted). The court must balance the nature and extent of the intrusion on the person with the governmental interests at stake. *Id.* at 395. In an excessive force claim, the court balances the quantum of force used against the need to use that quantum of force. *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

In considering a police officer's need to use a particular level of force, the court should consider several factors:

> [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (quoting *Graham*, 490 U.S. at 396). The court may also consider "the availability of alternative methods of capturing or subduing a suspect." *Id.* (quoting *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)). The court may also consider what officers knew about the suspect's health, mental condition, or other relevant frailties. *See, e.g.*, *Deorle*, 272 F.3d at 1282-83; *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). In considering these factors, the court may not rely on hindsight, and instead must judge the officer's conduct from the "perspective of a reasonable officer on the scene." *Id.* at 396. In doing so, the court must consider that "police officers are often forced to make split-second judgments – in

ORDER  – 6

circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 397.

### 2. Construing the Evidence Favorably to Ms. Brooks, the Officers Used Excessive Force.

The court begins its application of law to the facts before it by noting that the officers had a right to use "some degree of physical coercion or threat thereof" to effect Ms. Brooks' arrest. *Graham*, 490 U.S. at 396. Ms. Brooks argues that the officers lacked probable cause to arrest, but she is wrong as a matter of law. There is no dispute that Ms. Brooks refused to sign the notice of her traffic infraction. Under Washington law in effect in 2004, failure to sign the notice gave the officers the right to effect a custodial arrest. *See* RCW 46.64.015(1) (voiding time limits on arrest for traffic violation "[w]here the arrested person refuses to sign a written promise to appear in court as required by the citation and notice provisions of this section."). In 2006, the legislature amended the statute and related statutes, removing the requirement that an arrested person sign the notice of infraction, and withdrawing authorization to effect a custodial arrest for failure to sign the infraction. 2006 Wash. Adv. Legis. Serv. 270 (H.B. 1650). In November 2004, however, the officers had authority to arrest Ms. Brooks for her undisputed refusal to sign her notice of infraction.[1]

---

[1]Plaintiff provides a lengthy discussion of the charge on which Ms. Brooks was arrested, the charge on which she was booked, and the charge on which she was ultimately convicted, along with an alleged conspiracy on Defendants' behalf to modify citation documents. Pltf.'s Opp'n (Dkt. # 205) at 2-4. The officers' statutory authorization to arrest Ms. Brooks for her admitted refusal to sign her notice of infraction makes it unnecessary for the court to consider these assertions. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that the Fourth Amendment requires only probable cause to arrest for *any* crime, not necessarily the crime for which a suspect is charged or convicted). The court also need not consider the effect of the Supreme Court's recent decision in *Virginia v. Moore*, 128 S. Ct. 1598, 1607 (2008) (holding that state law barring arrest for particular crimes does not affect Fourth Amendment analysis).

ORDER  – 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

At the outset of their encounter with Ms. Brooks, the officers lawfully used force. First, by their presence, they coerced Ms. Brooks to remain at the scene, a use of force that manifestly does not offend the Constitution. They also used some force (e.g., the pain compliance hold) to attempt to remove Ms. Brooks from her car.

Viewed in the light most favorable to Ms. Brooks, the officers' use of a taser was a quantum leap from the relatively minor uses of force that they had used previously. Ofc. Jones states that he told Ms. Brooks that "the taser was going to hurt extremely bad if applied." This is consistent with Ms. Brooks' assertion that the taser was "extremely painful." Moreover, Ofc. Jones did not use the taser once – he used it three times in rapid succession. The court must now determine whether there was justification for using a level of force (whether once or three times) that hurt "extremely bad," and caused extreme pain.

Any reasonable officer would have acknowledged numerous factors limiting the degree of force he could use against Ms. Brooks. Considering first the severity of the crime at issue, there is no dispute that Ms. Brooks was being arrested for peaceably refusing to sign her name. This conduct is unlawful, or at least it was in 2004, but it is not a serious crime, and it is not a crime that endangers anyone. Courts have found that substantially more serious offenses nonetheless mitigate against the use of force. *E.g.*, *Smith*, 394 F.3d at 702 (domestic violence); *Davis*, 478 F.3d at 1055 (trespassing and obstructing police officer). No reasonable officer could have believed that the crime for which Ms. Brooks was arrested mitigated in favor of the use of a high degree of force.

Second, Ms. Brooks did not pose a danger to the public or to the officers, and there was no danger she would flee the scene. Throughout the standoff between herself and the officers, Ms. Brooks did not use force against the officers or threaten to do so. She does not deny that she used force to resist the officers' efforts to remove her from the

ORDER  – 8

car, but she used that force to immobilize herself, not to hurt the officers.  *See Davis*, 478 F.3d at 1055 (noting that unarmed suspect in pajamas poses little threat, even if refusing to obey officer's orders).  Until Ofc. Jones used the taser on her, there is no evidence that Ms. Brooks screamed or was physically demonstrative.

The officers' only argument regarding the danger Ms. Brooks posed is the transparently misleading allegation that she was in a car, and thus capable of hurting herself or others by driving away.  Ofc. Ornelas's incident report states that he turned Ms. Brooks' car off and removed the key from the ignition before Ofc. Jones used the taser on her.  Ornelas Decl., Ex. A ("I then reached over and turned the car key off and then removed the key from the vehicle's ignition.").  In the face of this admission, Defendants' repeated insistence that Ms. Brooks might have hurt someone with her car is wholly unconvincing, at best, and a misrepresentation to the court at worst.  *See*, *e.g.*, Ornelas Decl. ¶ 7 ("From my trained perspective, . . . there was no way to know whether she would attempt to drive away, creating a risk that one of us could be dragged or that she might cause a danger to citizens in any attempt to leave the scene."); Jones Decl., Ex. A ("This was a very dangerous situation, with the ignition running . . ."); Daman Decl. ¶ 7 (same).  The facts before the court show that Ms. Brooks posed no threat to anyone, and that the officers were able to disable her car without incident.  *See Deorle*, 272 F.3d at 1281 ("A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern.").

Ms. Brooks' statement to Ofc. Jones that she was pregnant was an additional factor mitigating against the use of a high level of force.

The evidence viewed favorably to Ms. Brooks shows that less extreme force could have been used to take her into custody.  While officers are not required to use the least intrusive level of force necessary to accomplish lawful goals, *Scott v. Henrich*, 39 F.3d

ORDER – 9

912, 915 (9th Cir. 1994), both the court and the jury must consider the alternatives available to the officers.  By the time Ofc. Jones brandished the taser, Ms. Brooks was under police control, except for her refusal to leave her car.  It is well established that no force can be used against a suspect who is completely under police control.  *E.g.*, *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2001); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994).  For a crime as minor as refusing to sign her name, the officers could simply have cited Ms. Brooks and released her without using force at all.[2]  But, even if the officers' were determined to take Ms. Brooks into custody, they could have attempted to do so with less violence.  Except for her refusal to leave her immobilized car, Ms. Brooks was completely under police control and not dangerous to the officers, herself, or others.  Under these facts, using a taser (whether once or three times) to secure the one element of control that the officers lacked was objectively unreasonable.  The officers might have tried numerous other means of removing her, but they did not.  *See, e.g.*, *Deorle*, 272 F.3d at 1282-83 (considering non-violent means of gaining control of an unarmed suspect); *Davis*, 478 F.3d at 1056 (describing range of less violent alternatives).

     Finally, the court notes that the officers did not need to make any split-second judgments about using force against Ms. Brooks.  There is no evidence that Ms. Brooks made sudden moves or attempted to flee the scene.  To do so, she would have had to either drive her car (whose keys were in Ofc. Ornelas's possession), or leave her car,

---

[2]It is established, for example, that in some circumstances police must allow felony suspects to escape rather than using deadly force. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The court need not reach the question of whether, in some circumstances, police must cite and release persons accused of minor crimes without arresting them rather than continue to escalate the use of force against them.  The court merely notes that citing Ms. Brooks and releasing her was a reasonable and less violent option available to the officers under these circumstances.

ORDER – 10

which she undisputedly refused to do.  So far as the record reveals, the officers could have remained on the scene indefinitely, and Ms. Brooks would not have fled.  *See Blankenhorn*, 485 F.3d at 478 (refusing to give deference to police decisions where "pace of events" did not warrant it).  Nothing rushed the officers' decision to escalate the force they used against Ms. Brooks.

Viewing the evidence in the light most favorable to Ms. Brooks, the officers' decision[3] to use a taser on Ms. Brooks was objectively unreasonable.  Using a taser to inflict extreme pain to effect the arrest for a minor regulatory offense of a non-violent pregnant woman already under police control is a Fourth Amendment violation.

### 2. The Scope of Ms. Brooks' Fourth Amendment Right Under These Circumstances Was Clearly Established.

Having found a triable question as to whether the officers violated Ms. Brooks' Fourth Amendment rights, the court must now determine whether the scope of that right was clearly established.  In this case, the relevant inquiry is whether it was clearly established that using a taser (once or three times) on an unarmed, non-violent, pregnant woman already under police control (although not in custody) was unconstitutional.  The parties have cited some authority that applies the *Graham* analysis in particular circumstances, but none of that authority addresses circumstances especially similar to those before the court.  Even so, it is not necessary to point to authority precisely on point to resolve the qualified immunity inquiry.  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (holding that requirement that existing authority be "materially similar" to case at bar is an unduly "rigid gloss" on qualified immunity).  Instead, it is enough if, "in the light of

---

[3]Although only Ofc. Jones used the taser on Ms. Brooks, Ofc. Jones and Sgt. Daman share liability with him.  Where officers on the scene are aware of another officers' decision to use force and do nothing to prevent it, they share liability.  *Blankenhorn*, 485 F.3d at 481 n.12; *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003).

pre-existing law[,] the unlawfulness [is] apparent." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In an "obvious case," the *Graham* factors themselves are sufficient to clearly establish that the officers' use of force was unlawful.  *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Davis*, 478 F.3d at1056-57.

The court holds that *Graham* clearly establishes that, construing the evidence in Ms. Brooks' favor, the use of a taser on her was unconstitutional.  *Graham* has long been the standard for assessing the use of force by police officers, and its guidelines are sufficient to clearly establish that some uses of force are unreasonable.  *Blankenhorn*, 485 F.3d at 481; *Brosseau*, 543 U.S. at 199.  In this case, where every *Graham* factor weighs in favor of using very little force, a prudent officer would have been on notice that the use of a device to cause extreme pain was not reasonable.  The court therefore concludes that the scope of Ms. Brooks' Fourth Amendment right with respect to the officers' conduct was clearly established.  *See Davis*, 478 F.3d at 1056-57 ("[W]e have no question that any reasonable officer would have known that the force used was excessive from an elementary understanding of law enforcement officers toward all individuals in the community they serve as well as from a review of the well-established law.").  Moreover, viewing the evidence in the light most favorable to Ms. Brooks, no officer could have reasonably (but mistakenly) believed that the law permitted him to use that quantum of force.

The court's qualified immunity ruling is consistent with *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137 (W.D. Wash. 2007) (Donohue, J.).  Although the court in *Beaver* considered an excessive force claim arising from the use of a taser, the similarities to this case end there.  The plaintiff in *Beaver* was a suspect on the scene of a residential burglary, who had not been searched for weapons, who appeared to be under the influence of drugs, and who did not comply with police commands to halt his retreat.

ORDER  – 12

507 F. Supp. 2d at 1140.  A police officer used a taser on the plaintiff five times.  *Id.* at 1141.  The *Beaver* court found that the first three applications of the taser did not violate the Constitution because they were used to stop a felony suspect from fleeing the scene. *Id.* at 1145 ("[The officer] was faced with unenviable choices and had to make split-second decisions, and this Court will not second-guess his decision to apply the use of the Taser.").  As to the final two applications of the taser, which came only seconds after another officer arrived on the scene to help control the plaintiff, the court found that the use of force was excessive.  *Id.*  The court held, however, that the officer had qualified immunity for the final two uses of the taser.  *Id.* at 1148.

*Beaver* does not bind this court, but even if it did, it would not change the court's analysis.  Any reasonable officer would understand the difference between the use of a taser in a heat-of-the-moment pursuit of a drug-addled felony suspect who could have been armed, and the use of a taser in a routine traffic stop against a pregnant suspect who had no weapons, presented no threat of violence, and gave police no reason to rush their decisions.  *Graham* and its progeny give police a means to distinguish between lawful and unlawful uses of force.  In the *Beaver* court's view, the circumstances before it were the sort for which *Graham* and other excessive force cases do not provide a clear answer. This court concludes that *Graham* provides a clear answer in the case at bar, at least when the evidence is construed in Ms. Brooks' favor.  The officers' use of a taser was unlawful.

**B.    Ms. Brooks' Assault and Battery Claims Against the Officers Survive Summary Judgment.**

For many of the reasons the court just discussed, Ms. Brooks' assault and battery claims present jury questions as well.  Battery is an intentional act resulting in "harmful or offensive contact with a person," and assault is an intentional act putting a person in fear of an imminent battery.  *McKinney v. Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App.

ORDER  – 13

2000).  Although Washington recognizes a form of qualified immunity for law enforcement officers, that immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest."  *Staats v. Brown*, 991 P.2d 615, 627-28 (Wash. 2000).  Instead, police liability for assault and battery turns on whether they comply with state law governing the use of force, a question that a jury must decide in light of the evidence before the court.  *See* RCW 9A.16.020(1).  Finally, although Ofc. Jones alone used the taser on Ms. Brooks, Ofc. Ornelas and Sgt. Daman can be held liable for aiding or abetting his actions.  Because a jury could find that the force the officers used on Ms. Brooks was excessive, summary judgment in the officers' favor is inappropriate.

**C.    Ms. Brooks Has No Evidence to Sustain Her § 1983 Claims Against the City.**

Ms. Brooks' effort to establish the City's liability presents a markedly different challenge than her claims against the officers.  A municipality violates § 1983 only when it adopts a policy, or longstanding custom equivalent to a policy, that results in a constitutional injury.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008); *see also Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978).  A plaintiff can make this showing in one of three ways: by pointing to a policy or custom that injured her, by pointing to an injury caused by an action taken in the official capacity of a policymaker, or by showing that a policymaker ratified a subordinate's unconstitutional act.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).  Whichever option she takes, a plaintiff must show that "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also Trevino*, 99 F.3d at 918 (requiring plaintiff to show that policy was the cause in fact and the proximate cause of the constitutional violation).

ORDER – 14

In this case, all evidence is that SPD itself, acting through Chief Kerlikowske as its head, was the sole entity within the City that made policy with respect to SPD officers' use of force. For that reason, the court uses "SPD" interchangeably with "the City" in its discussion of municipal liability under § 1983.

### 1. Ms. Brooks Has Not Produced Evidence From Which a Jury Could Conclude That a Policy or Custom Caused Her Injuries.

The only evidence of a formal SPD policy governing the use of force is the SPD Manual. The manual states that officers "shall use only the minimal amount of force necessary to overcome physical aggression or resistance to compliance with a lawful process." Cobb Decl., Ex. H at 1.[4] It explains that force is "necessary" where "no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." *Id.*

SPD's formal use-of-force policy is not unconstitutional. Indeed, the policy is more protective of citizen's rights than the Constitution, because it requires officers to use the least force necessary to accomplish their objectives. As previously noted, *Graham* and its progeny only require that the use of force be reasonable, not that it be the lowest quantum of force that will accomplish an officer's objectives. No reasonable jury could conclude that this policy caused Ms. Brooks' to suffer a constitutional deprivation. Had the officers who arrested her followed the policy, they would not have used the taser.

Lacking evidence of a formal policy that caused her constitutional harm, Ms. Brooks also fails to provide evidence of a "custom" that harmed her. To show an

---

[4]Defendants submitted a version of the SPD Manual effective in July 1996; Ms. Brooks submitted a version effective in January 2006. *Compare* Cobb Decl. (Dkt. # 193), Ex. H *with* Zubel Decl. (Dkt. # 216), Ex. 4. The January 2006 version was not in effect during Ms. Brooks' 2004 arrest, and neither party makes any effort to explain whether the July 1996 version was in effect in November 2004. Although the 2006 version reflects changes to the Manual, those changes do not alter the court's analysis. The court therefore relies on the 1996 version.

unconstitutional custom, Ms. Brooks must point to a "longstanding practice" that has become the "standard operating procedure" of the SPD.  *Gillette*, 979 F.2d at 1346-47. She must show that the custom is so "'persistent and widespread' that it constitutes a 'permanent and well-settled city policy.'"  *Trevino*, 99 F.3d at 918 (quoting *Monell*, 436 U.S. at 691).  A plaintiff must show "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918 (noting that sporadic or isolated incidents do not constitute a custom).

In this case, there is no evidence of a longstanding custom that caused Ms. Brooks' injuries.  Indeed, Plaintiff has provided no evidence from which any jury could find any relevant custom.  There is no evidence of a custom of using excessive force against persons arrested for minor crimes.  There is no evidence of an SPD custom of using tasers inappropriately against suspects of minor crimes under police control.  There is no evidence of any custom that caused Ms. Brooks' constitutional harm.

Rather than offer evidence of a relevant custom, Ms. Brooks offers evidence about range of barely relevant acts.  The evidence is insufficient for a jury to find the existence of any custom, much less a custom that led to Ms. Brooks' injury.  For example, Ms. Brooks focuses much attention on the Office of Professional Accountability ("OPA"), an SPD unit with oversight from officials and citizen boards outside the SPD.  One OPA function is to review citizen complaints of police misconduct.  Ms. Brooks undisputedly never made an OPA complaint, but she devotes much effort to establishing that SPD officials or persons connected with the SPD somehow tricked her into not filing a complaint.  The court declines to recount this evidence here, because it is wholly irrelevant.  Even if Ms. Brooks could establish that she had been misled into not filing a complaint, there is no evidence that this is an SPD custom.  There is no evidence that a

pre-existing custom of not investigating citizen complaints caused Ms. Brooks'
constitutional injury.  The same is true of Ms. Brooks' evidence that SPD failed to
investigate the officers' use of force against her.  There is no evidence that this is a
custom, and no evidence that it is a custom that caused her harm.  Moreover, as the court
has already noted in prior orders, it is impossible that the City's failure to investigate Ms.
Brooks' arrest *after* she was arrested caused the use of excessive force against her.
*Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), *rev'd in part on other grounds
by Brosseau v. Haugen*, 543 U.S. 194 (2004).

    If Ms. Brooks had presented evidence of a longstanding practice of ignoring or
rejecting citizen use-of-force complaints, with the effect of emboldening officers to use
force without fear of consequences, she could take her municipal liability claims to a
jury.  *See Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991) (crediting
evidence of a "two-year study" of citizen complaints within department showing that it
was "almost impossible for a police officer to suffer discipline as a result of a
complaint").  Ms. Brooks' evidence regarding SPD's treatment of her complaint after her
arrest falls well short of providing a jury with a basis to conclude that SPD emboldens its
officers to use excessive force against non-violent persons arrested for minor crimes, or
that the officers' who used force against her did so because of SPD's complaint
investigation process.

    Ms. Brooks also fails in her effort to impose liability on the City for alleged
inadequacies in its police training.  A § 1983 claim based on a municipality's failure to
train police requires proof that "the failure to train amounts to deliberate indifference to
the rights of persons with whom the police come into contact."  *Harris*, 489 U.S. at 388.
The plaintiff must also prove that her injury would have been avoided with proper
training.  *Blankenhorn*, 485 F.3d at 484.  To prove deliberate indifference, a plaintiff

must show that the city had actual or constructive notice that its training or failure to train would likely result in a constitutional violation, *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 (9th Cir. 2002), and that the city made a deliberate choice to ignore that likelihood. *Price*, 513 F.3d at 973.

On the record before the court, reasonable jurors could not conclude that SPD was deliberately indifferent in developing its training program with respect to the use of force. Ms. Brooks provided no evidence regarding what training the officers who arrested her received. Defendants' evidence shows that SPD officers, including the officers who arrested Ms. Brooks, were trained in accordance with the SPD use-of-force policy. As the court has already observed, that policy passes constitutional muster as applied to this case. *See Price*, 513 F.3d at 973 (noting that training according to constitutional policy does not evidence deliberate indifference). Ms. Brooks points to no specific inadequacies in the training – she merely surmises that if the officers were properly trained, they would not have used excessive force against her. The court must reject this argument. *See Harris*, 489 U.S. at 391 ("[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."). Plaintiff is obliged to produce evidence from which a jury could conclude that the City had notice that its training (or lack thereof) in the use-of-force was *likely* to result in the use of a taser against non-violent persons arrested for minor crimes, but declined to make changes. *Id.* at 390. She has not done so.

Several of Ms. Brooks' claims relate to the absence of policies or training. For example, she alleges that policies regarding the use of force on pregnant women, using tasers more than once against a suspect, and distinguishing between active and passive resistance would have prevented her injury. It is not enough, however, to point to holes in policy or training programs. Ms. Brooks must show that the failure to fill those holes

ORDER – 18

was deliberately indifferent to the rights of citizens in circumstances similar to her arrest. *See Bd. of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 412 (1997).  To do so, she would have to show that in November 2004, the City was on notice that its existing policies and training were so inadequate that its failure to improve the policies amounted to a conscious choice to ignore citizen's rights.  *Harris*, 489 U.S. at 390; *Brown*, 520 U.S. at 407 ("If a [training] program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for.").  Ms. Brooks provides only minimal evidence that officials connected with the OPA had made some recommendations to Chief Kerlikowske regarding changes to policy or training.  Most of those recommendations came *after* Ms. Brooks' arrest.  Ms. Brooks' evidence provides no basis for a jury to conclude that the City had notice of policy or training inadequacies such that it was deliberately indifferent in November 2004 to the likelihood of the use of excessive force against a citizen in comparable circumstances.

Summarizing its discussion of SPD custom, the court finds that Ms. Brooks' evidence does not create a triable issue as to the existence of any SPD custom, much less a custom which caused her injury.  On the record before the court, no reasonable jury could find a practice of sufficient frequency, duration, and consistency that it was a custom of the SPD.  Ms. Brooks' evidence, whether relating to SPD training, SPD's notice of inadequacies in its policies or training, or SPD's investigation of use-of-force complaints, is insufficient to carry her claims to a jury.

## 2. There is No Evidence that a Policymaker's Actions Directly Injured Ms. Brooks.

Ms. Brooks has not pointed to any official act by a policymaker that caused her constitutional harm.  To do so, she would have to show that a policymaker directed the

officers to use force against her.  *Trevino*, 99 F.3d at 920.  Ms. Brooks may not be asserting such a claim, but assuming that she is, she has no evidence to support it.

### 3.   There is No Evidence that a Policymaker Ratified the Officers' Use of Force Against Ms. Brooks.

Ms. Brooks claims that Chief Kerlikowske ratified the officers' use of force by failing to investigate them or discipline them.  Ratification, however, requires more than inaction, it requires a policymaker to "adopt[] and expressly approve[] of the acts of others who caused the constitutional violation."  *Trevino*, 99 F.3d at 920.  Absent evidence that elevates a "single failure to discipline" a police officer into a "confirmation of policy," a court must grant summary judgment.  *Haugen*, 351 F.3d 393; *see also Gillette*, 979 F.2d at 1347-48 (reviewing inadequacies in ratification claim).  Here, the evidence shows, at best, that Chief Kerlikowske and the SPD declined to commence an internal investigation of the officers' conduct while this litigation was pending.  There is no evidence that Chief Kerlikowske or any other policymaker affirmatively approved or condoned the officers' actions.

## D.   Ms. Brooks Cannot Sustain a § 1983 Claim Against Chief Kerlikowske.

Ms. Brooks has not attempted to distinguish between Chief Kerlikowske's acts in his official capacity and acts in his individual capacity.  To the extent that Ms. Brooks brings claims against Chief Kerlikowske in his official capacity, those claims are "equivalent to a suit against the [City] itself."  *Larez*, 946 F.2d at 647.  Having addressed Ms. Brooks' claims against the City, the court considers whether she has evidence establishing § 1983 liability against Chief Kerlikowske individually.

Chief Kerlikowske is liable in his individual capacity only if he participated in depriving Ms. Brooks of her rights, or if he "set[] in motion . . . acts which cause others to inflict constitutional injury."  *Larez*, 946 F.2d at 645 (noting that proof of liability in individual and official capacities is "subtle" and "oftentimes overlaps").  A police chief's

ORDER  – 20

liability is individual when his participation is not "attributable to official policy or custom." *Id.* Chief Kerlikowske cannot be held liable merely because he was the ultimate supervisor of the officers who arrested Ms. Brooks. *Id.*

Because there is no evidence that Chief Kerlikowske was directly involved in Ms. Brooks' arrest, the court focuses on whether he set in motion a chain of events that led to the unconstitutional use of force against her. Again, Ms. Brooks points to Chief Kerlikowske's alleged failure to discipline the officers who arrested her, and again she ignores that actions taken after her arrest could not have caused her harm. A supervisor does not become liable for his subordinate's actions by declining to discipline or investigate the subordinate. A supervisor can be held liable if he or she is aware of a subordinate's propensity to violate the law such that failure to discipline the subordinate evinces deliberate indifference to citizens with whom the subordinate will come in contact. *See Larez*, 946 F.2d at 646; *Brown*, 520 U.S. at 412. There is no evidence regarding any of the three officers' propensity to use excessive force. No authority of which the court is aware supports holding a supervisor liable in his or her individual capacity for an after-the-fact failure to discipline an officer for excessive use of force. As the court noted when discussing claims against the City, after-the-fact failure to discipline can, in limited circumstances, support a claim of a pre-existing policy or custom. That claim, however, lies only against the City (or, equivalently, against Chief Kerlikowske in his official capacity). *Larez*, 946 F.2d at 647. The court's review of the record reveals no basis for holding Chief Kerlikowske liable under § 1983 in his individual capacity.

**E.    Ms. Brooks Has No Evidence to Support Her State Law Claims Against Chief Kerlikowske and the City.**

Ms. Brooks asserts that both Chief Kerlikowske and the City are liable for negligent supervision and training. As the court has already noted, Ms. Brooks has failed to produce evidence from which a jury could conclude that her injuries are the result of

ORDER  – 21

inadequate supervision on behalf of Chief Kerlikowske, or inadequate training by either the Chief or the City. For that reason, she cannot establish causation, and cannot prevail in a claim for negligent supervision or training. The court thus finds it unnecessary to address whether various Washington immunity doctrines provide an additional shield from negligence liability.

**F.      The Court Will Not Consider the Parties' Improper Evidentiary Objections.**

Both parties violated this court's local rules by filing separate "evidentiary objections" with respect to evidence presented in support of and in opposition to the summary judgment motions. The local rules prohibit separately filed motions to strike material contained in motions or briefs, and require parties to use only their responsive briefs to make objections to "material contained in or attached to submissions of opposing parties." *See* Local Rules W.D. Wash. CR 7(g). Defendants expressly violated this rule by filing a motion to strike (Dkt. # 223), and Ms. Brooks cannot avoid the rule by entitling her motion to strike (Dkt. # 207) an "evidentiary objection." The court has reviewed these improper submissions to ensure that they present no argument that would have made a difference to the outcome of the summary judgment motions. The court has not otherwise considered them.

**G.      The Court Denies Most of Ms. Brooks' Motion to Amend.**

The court's review of Ms. Brooks' proposed amended complaint does not reveal why Ms. Brooks seeks leave to amend. She does not assert any new claims, although she withdraws her independent claim for intentional infliction of emotional distress, and admits that SPD is not a proper Defendant in this action. The bulk of the proposed amended complaint is devoted to adding detailed factual allegations and legal conclusions regarding, *inter alia*, the supposed lack of probable cause to arrest Ms. Brooks, SPD's Office of Professional Accountability ("OPA"), and the City's failure to follow OPA

ORDER  – 22

recommendations.  The deadline for amending pleadings in this case has long passed. The existing complaint is adequate to assert Ms. Brooks' claims.  So far as the court can tell, the proposed amendments have no impact on this litigation.

Just as Ms. Brooks' desire to amend her complaint is unexplained, Defendants' vociferous objection to the amended complaint is puzzling.  Defendants insist that they will suffer "manifest injustice" if the court permits the amendment, but they never explain why.  As the court has noted, Ms. Brooks adds no new claims, and her new allegations are merely more particularized versions of those supporting her existing claims.  There is no indication that the amended complaint would have any impact either on these summary judgment motions or at trial.

Under these circumstances, the court denies the motion to amend, in part because it is untimely, but mostly because the amended complaint appears to make no difference to this litigation.  The court grants the motion to amend to the extent that it withdraws Ms. Brooks' independent emotional distress claims and her claims against the SPD.

**H.      The Court Denies the Motion to Seal.**

Ms. Brooks filed a motion to seal several documents.  The court's local rules require a "compelling showing that the public's right of access is outweighed by the interests of the public and the parties in protecting files . . . from public review."  Local Rules W.D. Wash. CR 5(g).  Ms. Brooks did not attempt to make such a showing, but stated that she filed her motion to seal merely to ensure that she was not acting in violation of prior court orders regarding the protection of certain information. Defendants offered no response to Ms. Brooks' motion to seal.  The court denies the motion because neither party has attempted to make the "compelling showing" required to seal documents in this court.

ORDER  – 23

## IV.   CONCLUSION

For the reasons stated above, the court DENIES Defendants' summary judgment motion (Dkt. # 192) as to the officers who arrested Ms. Brooks, GRANTS Defendants' summary judgment motion (Dkt. # 202) as to Chief Kerlikowske and the City, DENIES Ms. Brooks' motion to amend (Dkt. # 229) except to the extent it withdraws certain claims, and DENIES Ms. Brooks' motion to seal (Dkt. # 217).

Dated this 12th day of June, 2008.

The Honorable Richard A. Jones
United States District Judge

ORDER  – 24